# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**TRESHA APODACA,**

       **Plaintiff,**

   **vs.**
                                         **Civ. No. 16-150 KK**

**NANCY A. BERRYHILL,**[1]
**Acting Commissioner of Social Security,**

       **Defendant.**

## MEMORANDUM OPINION AND ORDER[2]

    **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 12) filed August 1, 2016 in support of Plaintiff Tresha Apodaca's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits and for Title XVI supplemental security income benefits. On October 10, 2016, Plaintiff filed his Motion to Reverse and Remand for Rehearing With Supporting Memorandum ("Motion"). (Doc. 18.) The Commissioner filed a Response in opposition on January 4, 2017 (Doc. 22), and Plaintiff filed a Reply on January 27, 2017. (Doc. 24.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Carolyn Colvin as the Acting Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case. (Docs. 5, 8, 9.)

# I. Background and Procedural Record

Claimant Tresha Apodaca ("Ms. Apodaca") alleges that she became disabled on June 28, 2012,[3] at the age of forty-eight because of membranous neuropathy, nephrotic syndrome, pulmonary embolism, heart murmur, blood clots in lungs, and arthritis in hands and feet. (Tr. 48-49, 86.[4])  Ms. Apodaca has two years of college (Tr. 286), and worked as a manufacturing technician.  (286, 334-38.)

On March 14, 2012, Ms. Apodaca filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq.  (Tr. 208-11.)  On May 2, 2012, Ms. Apodaca filed for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq.  (Tr. 224-29.)   Ms. Apodaca's applications were initially denied on October 3, 2012.  (Tr. 84, 85, 86-96, 97-107, 148-51.)  They were denied again at reconsideration on July 10, 2013.  (Tr. 108-24, 125-41, 142, 143, 152-57.) On July 27, 2013, Ms. Apodaca requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 158-59.)   The ALJ conducted a hearing on August 6, 2014.   (Tr. 36-79.) Ms. Apodaca appeared in person at the hearing with attorney Michael Armstrong.  (*Id.*)  The ALJ took testimony from Ms. Apodaca (Tr. 43-69), and an impartial vocational expert ("VE"), Leslie White.  (Tr. 70-79.)

On October 17, 2014, the ALJ issued an unfavorable decision.  (Tr. 15-29.)   In arriving at his decision, the ALJ determined that Ms. Apodaca met the insured status requirements of the

---

[3] Ms. Apodaca initially represented that April 1, 2011, was her onset date.  (Tr. 208.)  At the administrative hearing, Ms. Apodaca's attorney, Michael Armstrong, moved to amend the onset date to June 28, 2012, to which she had no objection.  (Tr. 48-49.)

[4] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 12) that was lodged with the Court on August 1, 2016.

Act through December 31, 2017,[5] and that Ms. Apodaca had not engaged in substantial gainful activity since her alleged disability onset date.[6]  (Tr. 20-21.)  The ALJ found that Ms. Apodaca suffered from severe impairments of obesity, right knee problems/pain, plantar fasciitis/calcaneal spur, major depressive/episodic mood disorder, attention deficit/attention deficit hyperactivity disorder, post-traumatic stress disorder, explosive disorder NOS, and personality disorder NOS. (Tr. 21.)  The ALJ also determined that Ms. Apodaca suffered from non-severe impairments of acute sinusitis, status post kidney problems/nephropathy, status post pulmonary embolism, fatigue, and left upper extremity weakness/paresthesia.  (*Id.*)  However, the ALJ found that these impairments, individually or in combination, did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 21-23.)

Because he found that Ms. Apodaca's impairments did not meet a Listing, the ALJ then went on to assess Ms. Apodaca's residual functional capacity ("RFC").  The ALJ stated that

> [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) and 416.967(a) except she is able to perform work that allows her to sit or stand alternatively at 30 to 45 minute intervals for 2 to 3 minutes at a time, during which period she may remain on task.  She may occasionally climb ramps and stairs, balance, stoop, and crouch, but may never climb ladders/ropes/scaffolds, kneel, or crawl.  She may occasionally push, pull and engage in foot pedal operations with her right lower extremity.  She must avoid more than occasional exposure to extreme cold and vibration, and must avoid all exposure to hazards like dangerous machinery and unsecured heights.  She is able to learn, remember, and perform simple, routine, and repetitive work tasks, involving simple work instructions, which are performed in a routine, predictable, and low stress work environment, defined as one in which there is a regular pace, few work place changes, and no "over-the-shoulder" supervision.  She can adjust to routine changes in the workplace.  She can maintain concentration, persistence and pace for 2 to 3 hours at a time with normal breaks.  She may interact

---

[5] To receive benefits, a claimant must demonstrate disability prior to his date of last insured.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

[6] The ALJ noted that Ms. Apodaca worked part-time after her alleged onset date, but that it did not amount to substantial gainful activity.  (Tr. 21.)

appropriately with supervisors, coworkers, and the public on an occasional and superficial basis.

(Tr. 23.) Based on the RFC and the testimony of the VE, the ALJ concluded that Ms. Apodaca was not capable of performing her past relevant work, but that considering Ms. Apodaca's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform, and she was therefore not disabled. (Tr. 27-29.)

On December 30, 2015, the Appeals Council issued its decision denying Ms. Apodaca's request for review and upholding the ALJ's final decision. (Tr. 1-3.) On March 2, 2016, Ms. Apodaca timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

## II. <u>Standard of Review</u>

The Court will not disturb the Commissioner's denial of disability benefits if the final decision[7] is supported by substantial evidence and the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). In conducting its review, the Court meticulously examines the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*, and the Court "may not displace the agency's choice between two fairly conflicting views," even if it would have "made a different choice had the matter been before it *de novo*." *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007); *see also Sisco v. U.S. Dep't. of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

---

[7] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision. 20 C.F.R. §§ 404.981, 416.1481. This case fits the general framework, and the Court will therefore review the ALJ's decision as the Commissioner's final decision.

A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). Substantial evidence is "more than a scintilla but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

The Commissioner's decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ's decision should discuss the evidence supporting his decision, along with any "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.*; *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014).

### III. Applicable Law and Sequential Evaluation Process

A claimant is disabled under the Social Security Act if that individual has a severe medically determinable physical or mental impairment or impairments which can be expected to result in death or have lasted or can be expected to last for a continuous period of twelve months and that render the claimant unable to engage in any substantial gainful work in the national economy. 42 U.S.C. § 423(d)(1)(A) & (2)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993). In considering an application for disability insurance benefits, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520 and 416.920; *Bowen v.*

*Yuckert*, 482 U.S. 137, 140 (1987).  The claimant bears the burden of proof at the first four steps and must show that: (1) she is not engaged in "substantial gainful activity"; *and* (2) she has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) her impairment(s) meet or equal one of the Listings[8] of presumptively disabling impairments; *or* (4) she is unable to perform her "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan v. Barnhart,* 399 F.3d 1257, 1261 (10th Cir. 2005).  If the claimant can show that her impairment meets or equals a listed impairment at step three, the claimant is presumed disabled.  However, if at step three the claimant's impairment does not meet or equal a listed impairment, before moving on to step four of the analysis, the ALJ must consider all of the relevant medical and other evidence, including all of the claimant's medically determinable impairments whether "severe" or not, and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations.  20 C.F.R. §§ 404.1545(a)(1)-(3).  This is the claimant's residual functional capacity ("RFC") which the ALJ uses to determine whether the claimant can perform his past relevant work.  20 C.F.R.  §§  404.1545(a)(1)  &  (a)(3), 404.1520(a)(4), 404.1520(e), 416.945(a)(1)  & (a)(3); 416.920(a)(4), 416.920(e).   If the claimant establishes that he cannot perform his past relevant work, the burden of proof then shifts to the Commissioner at step five of the sequential evaluation process, to show that the claimant is able to perform other work in the national economy, considering her RFC, age, education, and work experience.  *Id.*; *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social

---

[8] 20 C.F.R. pt. 404, subpt. P. app. 1.

security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). "This is true despite the presence of counsel." *Henrie*, 13 F.3d at 361. "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination. *Madrid*, 447 F.3d at 791-92. The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

## IV. <u>Analysis</u>

Ms. Apodaca asserts five arguments in support of her Motion as follows: (1) the ALJ failed to give proper reasons for rejecting the opinion of treating psychiatrist E. B. Hall, M.D.; (2) the ALJ offered no explanation for ignoring the State agency nonexamining psychological consultant Donald Gucker, M.D.'s opinion; (3) the ALJ should have applied SSR 83-12 when making his decision; (4) the ALJ's step five finding is not supported by substantial evidence because the VE's testimony regarding the number of available jobs is not reliable; and (5) the ALJ failed to resolve the conflict between the DOT and the VE's testimony regarding Ms. Apodaca's need to alternate between sitting and standing. (Doc. 18 at 14-26.) The Court will address each argument in turn.

### A. <u>The ALJ Satisfied Both Parts of the Treating Physician Inquiry</u>

Ms. Apodaca argues that the ALJ rejected Dr. Hall's opinion and failed to provide good and legitimate reasons for doing so. (Doc. 18 at 14-18.) The Commissioner contends the ALJ

provided several good reasons which were grounded in substantial evidence. (Doc. 22 at 11-14.) The Court is satisfied that the ALJ applied correct legal principles in declining to give controlling weight to Dr. Hall's opinion, and his decision was supported by substantial evidence.

Ms. Apodaca saw treating psychiatrist, Dr. E. B. Hall, six times from April 8, 2014, through July 14, 2014, for her reported mood disorder. (Tr. 533-37, 541-44, 546-49, 552-55, 580-83, 588-91.) On July 14, 2014, Dr. Hall completed Listing 12.04 *Affective Disorder* and 12.06 *Anxiety-Related Disorder* forms on Ms. Apodaca's behalf and indicated that she met the A, B and C criteria for each (Tr. 524-25). *See* 20 C.F.R. pt. 404, subpt. P. app. 1, 12.00.A, 12.04 and 12.06 (explaining the criteria and required level of severity to meet a listing). Dr. Hall also completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) and assessed that Ms. Apodaca had *slight* limitations in her ability (1) to remember locations and work-like procedures; (2) to carry out very short and simple instructions; and (3) to set realistic goals or make plans independently of others. (Tr. 521-22.) He assessed that she had *moderate* limitations in her ability (1) to understand and remember very short and simple instructions; (2) to understand and remember detailed instructions; (3) to maintain attention and concentration for extended periods of time, (4) to perform activities within a schedule, (5) to sustain an ordinary routine without special supervision, and (6) to make simple work-related decisions; (7) to ask simple questions or request assistance; (8) to accept instructions and respond appropriately to criticism from supervisors; (9) to get along with coworkers or peers without distracting them or exhibiting behavior extremes; (10) to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (11) to respond appropriately to changes in the work place; and (12) to be aware of normal hazards and take adequate precautions. (*Id.*) Dr. Hall further assessed that Ms. Apodaca had *marked* limitations in her

ability (1) to carry out detailed instructions; (2) to complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) to interact appropriately with the general public; and (4) to travel in unfamiliar places or use public transportation. (*Id.*)

According to what has become known as the treating physician rule, an ALJ will generally give more weight to medical opinions from treating sources than those from non-treating sources. *Langley*, 373 F.3d at 1119 (citing 20 C.F.R. § 404.1527(d)(2)). An ALJ is required to conduct a two-part inquiry with regard to treating physicians. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must decide whether a treating doctor's opinion commands controlling weight. *Id.* A treating doctor's opinion must be accorded controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (applying SSR 96-2p, 1996 WL 374188, at *2)).[9] If a treating doctor's opinion does not meet this standard, the opinion is still entitled to deference to some extent as determined under the second step of the process. *Id.* In this second step, the ALJ must determine the weight to accord the treating physician by analyzing the treating doctor's opinion against the several factors provided in 20 C.F.R. §§ 404.1527(c) and 416.927(c).[10] *Id.* The ALJ is not required to "apply expressly" every

---

[9] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35*; see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

[10] These factors include:

> (1) Examining relationship. . . . (2) Treatment relationship. . . . (i) Length of the treatment relationship and the frequency of examination. . . . (ii) Nature and extent of the treatment relationship. . . . (3) Supportability. The more a medical source presents evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that opinion. The better an

relevant factor. *Oldham*, 509 F.3d at 1258. "Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons . . . for the weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Langley*, 373 F.3d at 1119 (quoting *Watkins*, 350 F.3d at 1300). Finally, if the ALJ rejects the opinion completely, he must then give "'specific, legitimate reasons'" for doing so. *Watkins*, 350 F.3d at 1301 (citing *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996) (quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987)).

The ALJ satisfied both parts of the two-part inquiry *Krauser* requires. 638 F.3d at 1330. First, although the ALJ did not explicitly state that Dr. Hall's opinion was not entitled to controlling weight, his finding was implicit in his decision. (*See e.g.* Tr. 25, 26, 27, according "virtually no weight" to opinion that claimant is disabled and "no weight" to portion of opinion that claimant "has a complete inability to function outside her home," and noting lack of supporting documentation and inconsistency with the record as a whole.) Next, in determining that Dr. Hall's opinion was entitled to virtually no weight, the ALJ did not expressly apply the

---

explanation a source provides for an opinion, the more weight [the ALJ] will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the ALJ] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. [The ALJ] will evaluate the degree to which these opinions consider all of the pertinent evidence in [a claimant's] claim, including opinions of treating and other examining sources. (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion. (5) Specialization. [The ALJ will] generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. (6) Other factors. When [the ALJ] consider[s] how much weight to give to a medical opinion, [the ALJ] will also consider any factors [brought] to [his] attention or of which [he is] aware, which tend to support or contradict the opinion. For example, the amount of understanding of [SSA's] disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record are relevant factors that [the ALJ] will consider in deciding the weight to give a medical opinion.

20 C.F.R. §§ 404.1527(c) and 416.927(c).

regulatory factors, but his decision considered them, and provided specific and legitimate reasons for the weight accorded Dr. Hall's opinion. The ALJ's reasons for the weight he accorded Dr. Hall's opinion are supported by substantial evidence.

In his decision, the ALJ correctly identified Dr. Hall's psychiatric specialty and the length of the treatment relationship from April 2014 through July 2014 during which Ms. Apodaca saw Dr. Hall for her reported mood disorder.[11] (Tr. 25, 533-37, 541-44, 546-49, 552-55, 580-83, 588-91.) *See* 20 C.F.R. 404.1527(c)(2)(i), 416.927(c)(2)(i) (the longer a treating source has treated a claimant and the more times a claimant has been seen are bases for more weight). The ALJ explained that Dr. Hall's assessment was not supported by his treatment notes. (Tr. 25, 26-27.) He discussed that Dr. Hall's treatment notes documented normal psychiatric and cognitive functioning and that Dr. Hall had not submitted any medical records to support his assessment that Ms. Apodaca had marked limitations in her ability to do work-related mental activities. (Tr. 25, 26.) The record supports that Dr. Hall performed mental status/physical exams during five of Ms. Apodaca's six appointments, *all* of which indicated a normal mental status other than having a sad and/or depressed mood.[12] (Tr. 534-35, 542-43, 547-48, 553-54, 581-82.) The ALJ also discussed that Dr. Hall consistently assigned Ms. Apodaca a GAF score of 66,[13] which was indicative of good overall functioning.[14] (Tr. 25, 27.) The record supports

---

[11] Ms. Apodaca testified that she treated with Dr. Hall in the late 1990s for marriage counseling. (Tr. 45.)

[12] Dr. Hall's mental status/physical exam evaluated appearance, behavior, speech, mood, affect, thought process, thought content, insight/judgment, consciousness, orientation, recent memory, remote memory, attention/concentration; language (naming), language (repeating phrase), language (abstraction), fund of knowledge, gait/station, muscle strength, and muscle tone. (Tr. 534-35, 542-43, 547-48, 553-54, 581-82.)

[13] The GAF is a subjective determination based on a scale of 100 to 1 of a "clinician's judgment of the individual's overall level of functioning." *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32. A GAF score of 61-70 indicates mild symptoms (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34.

this finding. (Tr. 535, 543, 548, 554, 582.) *See* 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3) (more weight will be given to medical source opinions that are supported by relevant evidence, particularly medical signs and laboratory findings).

The ALJ also explained that Dr. Hall's listing evaluations and function assessment were internally inconsistent. (Tr. 26-27.) The ALJ discussed that Dr. Hall completed forms related to Listing 12.04 *Affective Disorders* and Listing 12.06 *Anxiety-Related Disorders* and indicated that Ms. Apodaca met the criteria for both listings. (Tr. 26-27, 524-25.) On both listing forms Dr. Hall checked that Ms. Apodaca had *marked* restriction in her activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace. (*Id.*) Dr. Hall also checked that Ms. Apodaca had experienced repeated episodes of decompensation. (*Id.*) As the ALJ noted, however, on the mental assessment form Dr. Hall checked that Ms. Apodaca had marked limitations in only two of the eight areas listed under sustained concentration and persistence, and in only one of the five areas listed under social interaction. (Tr. 27, 521-22.) The record supports the ALJ's finding. (Tr. 521-22, 524-25.)

The ALJ further explained that Dr. Hall's assessment was inconsistent with the record as a whole. (Tr. 26.) The ALJ noted and the record supports that Ms. Apodaca testified she was attending college two days a week for four to six hours each day since August 2012. (Tr. 27, 52-53.) The ALJ explained that Dr. Hall's assessment that Ms. Apodaca was unable to function outside her home was belied by the fact that she had been actively attending college for two years. (Tr. 27.) The record also reflects that prior to seeking care from Dr. Hall, Ms. Apodaca's

---

[14] Ms. Apodaca argues that the ALJ's reliance on the GAF score is an illegitimate reason for rejecting Dr. Hall's opinion. (Doc. 18 at 17-18.) The Court is not persuaded. A GAF score may be of considerable help to the ALJ in formulating the RFC and is part of the record evidence which must be considered by the Commissioner in light of the facts and circumstances of the particular case at issue. *Holcomb v. Astrue*, 389 F. App'x 757, 759 (10th Cir. 2010) (unpublished); *Petree v. Astrue*, 260 F. App'x 33, 42 (10th Cir. 2007) (unpublished). Here, the ALJ's reliance on the GAF score was one of several reasons discussed for the weight he accorded Dr. Hall's opinion.

mental health care history and treatment was minimal. On February 1, 2013, Ms. Apodaca saw healthcare provider Benjamin Buxton, M.D., and complained of, *inter alia*, depression.[15] (Tr. 464.) Ms. Apodaca explained that her father had recently passed away, and that issues with her son and daughter-in-law necessitated her taking custody of her granddaughter. (Tr. 464.) Dr. Buxton prescribed Celexa and saw Ms. Apodaca in follow up on February 8, 2013, March 8, 2013, and April 4, 2013. (Tr. 460, 462, 463.) Ms. Apodaca reported on March 8, 2013, that her depression was improving. (Tr. 462.) One year later, on March 5, 2014, Ms. Apodaca complained to CNP Myrna Gallegos that she had experienced episodes of depression for the past three years. (Tr. 513-16.) Ms. Apodaca explained that her symptoms were made worse by fatigue and family stressors. (Tr. 514.) CNP Gallegos noted that Ms. Apodaca's affect and mood seemed normal, and that there was no decrease in her concentrating ability. (Tr. 516.) CNP Gallegos assessed depression, encouraged counseling, and prescribed Bupropion. (Tr. 513-14.) Ms. Apodaca followed up with CNP Gallegos on May 7, 2014, but in the meantime had started treatment with Dr. Hall. (Tr. 517-19.) CNP Gallegos noted that Ms. Apodaca's patient health questionnaire reflected severe depression, but assessed that her depressed mood was stable with no changes. (Tr. 518-19.) CNP Gallegos instructed Ms. Apodaca to continue the same medication and encouraged her continued attempts to lose weight and engage in daily exercise. (Tr. 517.)

"Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." *Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) (quoting *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995)); *see also* 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3) (more weight will be given to medical source opinions that are supported by

---

[15] Ms. Apodaca was establishing herself as a new patient and also reported her medical history of blood clots and kidney disease. (Tr. 464.)

relevant evidence). The lack of internal consistency and consistency between Dr. Hall's assessment and the record as a whole were valid reasons for the ALJ to accord minimal to no weight to Dr. Hall's opinion. *Pisciotta*, 1074 F.3d at 1078; 20 C.F.R. §§ 404.1527(c)(4) and 416.927(c)(4). The ALJ's determination that Dr. Hall's opinion was not entitled to controlling weight was implicit in his decision, and the ALJ provided good reasons supported by substantial evidence for the weight he ultimately accorded Dr. Hall's opinion. *See Armijo v. Astrue*, 385 F. App'x 789, 795 (10th Cir. 2010) (finding that ALJ's implicit determination that treating physician's opinion was not entitled to controlling weight was supported by substantial evidence); *see also Tarpley v. Colvin*, 601 F. App'x 641, 643-44 (10th Cir. 2015) (finding ALJ's failure to explicitly state whether treating physician was entitled to controlling weight was harmless where ALJ adequately explained weight given); *Watkins*, 350 F.3d at 1300 (an ALJ's decision must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight). As such, there is no reversible error on this point.

**B.      The ALJ's Failure To Expressly Discuss Dr. Gucker's Opinion Is Harmless Error**

Ms. Apodaca argues that the ALJ erred by failing to discuss State agency nonexamining psychological consultant Donald K. Gucker, Ph.D.'s opinion, and that had he done so a more restrictive RFC would have resulted. (Doc. 18 at 18-20.) Specifically, Ms. Apodaca argues that the ALJ's RFC fails to account for certain of Dr. Gucker's Section I moderate limitations. (*Id.*) The Commissioner contends that the ALJ considered Dr. Gucker's opinion and found his opinion consistent with the treatment record. (Doc. 22 at 14-15.) The Commissioner further contends that the ALJ's RFC finding accounted for all the limitations Dr. Gucker identified. (*Id.*)

The ALJ's failure to expressly discuss Dr. Gucker's opinion is harmless error for several reasons. First, the record supports that the ALJ considered Dr. Gucker's opinion in making his RFC assessment. Although the ALJ does not refer to Dr. Gucker by name, the ALJ stated that he

> gave great weight to the opinions of State agency medical consultants, who found the claimant capable of performing light work with postural and manipulative restrictions. (Exhibits 5A; and 7A).[16] These assessments are consistent with the evidence of record as a whole.

(Tr. 27). The ALJ also specifically referred to the State agency psychological consultant opinions when he applied the required special technique[17] at steps two and three of his determination to assess the severity of Ms. Apodaca's mental impairments and their effect on her ability to work. (Tr. 22.) Finally, the ALJ explicitly stated that he had carefully considered the entire record in assessing Ms. Apodaca's RFC. (Tr. 23.) The Tenth Circuit has stated that it will take the ALJ at his word when the entirety of the ALJ's discussion of the evidence and the reasons for his conclusions demonstrate that he adequately considered the claimant's impairments. *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009). The ALJ's discussion and the reasons for his conclusions demonstrate he did so here.

Second, Dr. Gucker's Section III narrative accounted for all of his Section I findings. On September 18, 2012, State agency nonexamining psychological consultant Donald J. Gucker, Ph.D., reviewed Ms. Apodaca's medical records and prepared a Psychiatric Review Technique[18]

---

[16] Exhibit 5A is the Disability Determination Explanation (Initial) that includes, *inter alia*, the PRT and MRFCA Dr. Gucker prepared. (Tr. 86-96.) Exhibit 7A is the Disability Determination Explanation (Reconsideration) that includes, *inter alia*, a PRT and MRFCA prepared by State agency nonexamining psychological consultant Julian Lev, Ph.D., in which he affirms Dr. Gucker's assessment. (Tr. 108-124.)

[17] *See* 20 C.F.R. §§ 404.1520a, 416.920a (describing the special technique required for evaluation of mental impairments).

[18] "The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph

and a Mental Residual Functional Capacity Assessment ("MRFCA"). In Section I of the MRFCA, Dr. Gucker assessed that Ms. Apodaca had *no limitations* in her ability to understand and remember. (Tr. 93.) He assessed that she was *not significantly limited* in her ability (1) to carry out very short and simple instructions; (2) to perform activities within a schedule; (3) to maintain regular attendance, and be punctual within customary tolerances; (4) to make simple work-related decisions; (5) to ask simple questions or request assistance; (6) to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (7) to be aware of normal hazards and take appropriate precautions; and (8) to travel in unfamiliar places or use public transportation. (Tr. 93-94.) Finally, Dr. Gucker assessed that Ms. Apodaca had *moderate limitations* in her ability (1) to carry out detailed instructions; (2) to maintain attention and concentration for extended periods; (3) to sustain an ordinary routine without special supervision; (4) to work in coordination with or in proximity to others without being distracted by them; (5) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) to interact appropriately with the general public; (7) to accept instructions and respond appropriately to criticism from supervisors; (8) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (9) to respond appropriately to changes in the work setting. (*Id*.) In Section III of the MRFCA, Dr. Gucker explained that

> [r]egarding mental issues only, the claimant when TX and medication compliant,[19] *retains the ability to perform simple, repetitive tasks in spite of the*

---

B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4.

[19] There is no evidence in the medical record that at the time Dr. Gucker completed the MRFCA that Ms. Apodaca had been prescribed any treatment and/or medication for any mental impairment. On September 7, 2012, State agency examining psychological consultant Paula Hughson, M.D., suggested that Ms. Apodaca "might benefit from psychiatric management, including medication trials and psychotherapy." (Tr. 438.)

> *moderate limitations noted above. Claimant is able to meet the basic mental demands of work on a sustained basis* despite limitations resulting from identified MDIs. Optimal work performance will likely occur in settings that de-emphasize social contacts.

(Tr. 95.) (Emphasis added.) Thus, Dr. Gucker accounted for all the limitations he found in Section I and concluded in Section III that despite the moderate limitations he noted, Ms. Apodaca could engage in work on a sustained basis that involved simple, repetitive tasks and de-emphasized social contacts. (*Id.*)

Third, there is no inconsistency between the ALJ's RFC assessment and Dr. Gucker's Section III opinion. Dr. Gucker opined that Ms. Apodaca "retained the ability to perform simple, repetitive tasks in spite of the moderate limitations noted[.]" (Tr. 95.) The ALJ in turn determined that Ms. Apodaca could "learn, remember, and perform simple, routine, and repetitive work tasks, involving simple work instructions, which are performed in a routine, predictable, and low stress work environment, defined as one in which there is a regular pace, few work place changes, and no 'over-the-shoulder' supervision." (Tr. 23.) Dr. Gucker opined that Ms. Apodaca's "[o]ptimal work performance [would] likely occur in settings that de-emphasize[d] social contacts." (Tr. 95.) To that end, the ALJ determined that Ms. Apodaca "may interact appropriately with supervisors, coworkers, and the public on an occasional and superficial basis." (Tr. 23.) Although Ms. Apodaca argues that the ALJ should have accounted for *every* Section I moderate limitation Dr. Gucker assessed, her argument fails because in this case Dr. Gucker's Section III narrative adequately captured the limitations he found in Section I, and the ALJ's RFC fully incorporated Dr. Gucker's Section III assessment. *See Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015) (unpublished)[20] (finding no reversible error

---

[20] Unpublished decisions are not binding precedent in the Tenth Circuit, but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

regarding the ALJs mental RFC assessment because the ALJ sufficiently captured the essence of psychological consultant's Section III narrative which had adequately encapsulated the Section I limitations); *see also Nelson v. Colvin*, 655 F. App'x 626, 628-29 (10th Cir. 2016) (unpublished) (finding no reversible error regarding the ALJ's mental RFC because the Section III narrative adequately captured the limitations found in Section I and the ALJ incorporated the Section III assessment in mental RFC).

Finally, the alleged error does not prejudice Ms. Apodaca. Here, the ALJ considered Dr. Gucker's opinion, accorded it great weight, and fully incorporated Dr. Gucker's assessed limitations in Ms. Apodaca's mental RFC. Ms. Apodaca has failed to demonstrate how an express discussion of Dr. Gucker's opinion would have helped her, and the Court's thorough review of the entire record satisfies it that Ms. Apodaca has not suffered any prejudice in this regard. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162-63 (10th Cir. 20120) (noting that giving greater weight to an opinion would not have helped the claimant and thus the ALJ's alleged error did not prejudice the plaintiff).

For all of these reasons, the Court finds that the ALJ considered Dr. Gucker's opinion and that his failure to expressly discuss it is harmless error. As such, there is no reversible error as to this issue.

### C. The ALJ Was Not Required To Use the Sedentary Exertional Table in the "Grids" and Find Ms. Apodaca Disabled

Ms. Apodaca next argues that because the ALJ's RFC limited her to less than a full range of light work, her exertional capacity fell between Rule 202.14 (Table 2) and Rule 201.14 (Table 1) in the Medical-Vocational Guidelines. (Doc. 18 at 20-21.) She further argues that pursuant to SSR 83-12 and POMS DI 25025.015, the ALJ was required to consider the extent of any erosion to the occupational base, and that had he done so, Rule 201.14 would have applied

and directed a finding of "disabled." (*Id.*) The Commissioner contends that the ALJ appropriately consulted a vocational expert about the implications on the occupational base in light of Ms. Apodaca's strength limitations and in doing so there was no error. (Doc. 22 at 18-19.)

The need to alternate between sitting and standing presumes that the occupational base is eroded. SSR 83-12, WL 31253, at *4 (explaining that when there is a need to alternate between sitting and standing, a claimant is not functionally capable of the prolonged standing or walking contemplated for most light work or the prolonged sitting contemplated by most sedentary work). As such, a claimant falls between the grid rules for light and sedentary work. *See* POMS DI 25025.015.A.2. *Using a Rule as a Framework When Exertional Capacity Falls Between Two Rules*[21] (instructing that an adjudicator should "[a]ssume that an RFC for standing/walking/sitting less than the top level of standing/walking/sitting requirements represents an RFC falling between exertional levels of work"). DI 25025.015 explains that

> determining whether a claimant is disabled is a more difficult judgment when his or her exertional capacity falls in the middle of two rules and the rules direct opposite conclusions. In this situation apply the:
>
> •  higher-numbered rule and find the claimant not disabled if you conclude the claimant has a slightly reduced capacity for the higher level of exertion;[22] or
>
> •  lower-numbered rule and find the claimant disabled if you conclude the claimant has a significantly reduced capacity for the higher level of exertion.[23]

---

[21] The POMS is "a set of policies issued by the Administration to be used in processing claims." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999).

[22] Rule 202.14 directs that a person who has an RFC for light work, who is closely approaching advanced age, who is a high school graduate or more, and who has skilled or semi-skilled skills that are not transferable is not disabled. 20 C.F.R., Pt. 404, Subpt. P. App. 2, § 202.14.

[23] Rule 201.14 directs that a person who has an RFC for sedentary work, who is closely approaching advanced age, who is a high school graduate or more but whose education does not provide for direct entry into skilled work, and

DI 25025.015.D. The policy goes on to state that if necessary, the adjudicator should use the assistance of a vocational specialist to determine which rule most closely approximates the claimant's RFC and vocational factors of age, education, and past work experience. *Id.* SSR 83-12 instructs that

> in situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability. Accordingly, [vocational specialist] assistance is advisable for these types of cases.

SSR 83-12, 1983 WL 31253, at *2-3. SSR 83-12 also states that "[i]n cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base." *Id.* at *4.

Here, the ALJ used the Medical-Vocational Guidelines as a framework for his decision and found that if Ms. Apodaca were able to do a full range of light work that Rule 202.14 would apply and direct a finding of "not disabled." The ALJ explained, however, that

> the claimant's ability to perform all or substantially all of the requirements of [light work] has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.

(Tr. 28.) Based on the VE's testimony, the ALJ concluded that considering Ms. Apodaca's age, education, work experience, and RFC, she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (Tr. 29.) He therefore determined that a finding of "not disabled" was appropriate under the framework. (*Id.*)

---

who has skilled or semi-skilled skills that are not transferable is disabled. 20 C.F.R., Pt. 404, Subpt. P. App. 2, § 201.14.

Ms. Apodaca argues, without more, that her sit-stand option "more than slightly reduced [her] ability to perform a full range of light work" such that Rule 201.14 should have applied and directed a finding of "disabled." (Doc. 18 at 20.) The Court is not persuaded. DI 25025.15 instructs that an adjudicator should use the lower-numbered rule if they conclude a claimant has a *significantly* reduced capacity for the higher level of exertion. POMS DI 25025.15.D. Here, the ALJ indicated Ms. Apodaca's additional limitations *impeded* her ability to do a full range of light work, while Ms. Apodaca argues they *more than slightly* reduced her ability to perform a full range of light work. (Tr. 28, Doc. 18 at 20.) Neither of these descriptions, on their face, demonstrate a significant reduction. More to the point, however, the ruling and policy language is permissive and does not mandate a finding of disabled when a claimant falls between two rules that direct opposite conclusions. *Casey*, 76 F. App'x at 911. Instead, the ALJ must consider all of the relevant facts of the case before reaching a determination, and consult a vocational specialist to clarify the implications for the occupational base. *Channel*, 747 F.2d at 570; SSR 83-12, 1983 WL 31253, at *4. The ALJ did so here.

For the foregoing reasons, the Court finds the ALJ properly consulted a VE to determine the extent of any erosion to the occupational base given Ms. Apodaca's additional exertional limitations and appropriately relied on Rule 202.14 as a framework to determine that Ms. Apodaca was not disabled. *See Casey*, 76 F. App'x at 911 (citing *Moore v. Apfel*, 216 F.3d 864, 870-71 (9th Cir. 2000) (stating that, when a claimant's exact place between the grids is difficult to determine, SSR 83-12 mandates the use of a VE, not a finding of "disabled")); *see also Anders v. Berryhill*, No. 15-4181, slip op. at 11-12 (10th Cir. Apr. 18, 2017) (finding the ALJ adhered to the guiding principles laid out in the agency rulings by consulting a VE to determine the extent of any erosion to the occupational base where the claimant fell between the

grid rules for light and secondary work that directed opposite conclusions).  As such, there is no reversible error as to this issue.

### D. The ALJ Appropriately Relied on the VE's Testimony As Substantial Evidence To Determine Jobs Existed in Significant Numbers in the National Economy

Ms. Apodaca argues that the ALJ's step five findings are not supported by substantial evidence because the VE's testimony regarding the number of jobs in the national economy is not reliable.  (Doc. 18 at 21-24.)  Ms. Apodaca asserts that certain of the jobs the VE identified[24] are subcategory jobs within an Occupational Employment Statistics Grouping ("OES Group"). (*Id.*)  For example, she explains that the jobs of checker and shipping and receiving weigher are subcategories of an OES Group entitled "Weighers, Measurers, Checkers, and Samplers – Recordkeeping."  (*Id.* at 22.)   Based on this assertion, Ms. Apodaca argues that the VE's testimony is not based on substantial evidence because the job numbers she provided represent OES Groups and not the actual subcategory job.[25]   (*Id.*)   The Commissioner contends that regulations and Tenth Circuit case law make clear that an ALJ may rely on VE testimony in evaluating whether a claimant can do work that exists in significant numbers in the national economy.  (Doc. 22 at 19-24.)  The Commissioner also contends that the VE did not refer to the OES in her testimony or give any indication that she relied on the OES for her job numbers.  (*Id.* at 19-20.)

---

[24] The VE identified jobs of "checker I," DOT 222.687-010, light, SVP 2 (14,000 jobs in the national economy); "cleaner and polisher," DOT 709.687-010, light, SVP 2 (13,000 jobs in the national economy); "shipping and receiving weigher," DOT 222.387-074, light, SVP 2 (19,000 jobs in the national economy); "document preparer," DOT 249.587-018, sedentary, SVP 2 (45,000 jobs in the national economy); and "addresser," DOT 209.587-010, sedentary, SVP 2 (9,000 jobs in the national economy).  (Tr. 74-75.)

[25] Ms. Apodaca also argues that the VE's testimony regarding the job numbers is not supported by substantial evidence because the OES Groups include subcategory jobs that exceed Ms. Apodaca's RFC.  (Doc. 18 at 22-23.) The Court does not address this argument because it finds the ALJ appropriately relied on the VE testimony that jobs existed in significant numbers in the national economy as substantial evidence.

"If a disability claimant shows that [s]he can no longer perform any of [her] past jobs, [s]he is disabled unless the administrative law judge (ALJ) finds that [s]he can do some other kinds of work." *Haddock v. Apfel*, 196 F.3d 1084, 1086 (10th Cir. 1999). The "burden of going forward shifts to the Secretary, who must show that the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists [in significant numbers] in the national economy." *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992) (internal quotation and citation omitted). To determine whether jobs exist in significant numbers, regulations require the Commissioner to take administrative notice of reliable job information from various governmental and other publications. 20 C.F.R. 404.1566(d). Among the publications the regulations identify is the *Dictionary of Occupational Titles*, published by the Department of Labor.[26] 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1). The Commissioner may also use the services of a vocational expert or other specialist to determine whether a claimant's work skills can be used in specific occupations. 20 C.F.R. §§ 404.1566(e), 416.966(e); *see also Rogers v. Astrue*, 312 F. App'x 138, 142 (10th Cir. 2009) (unpublished) (explaining that the whole point of vocational testimony is to go beyond facts already established through publications eligible for judicial or administrative notice and provide an alternative avenue of proof) (citing *Gay v. Sullivan*, 986 F.2d 1336, 1340 (10th Cir. 1993)).

Here, the ALJ utilized VE Leslie White to determine whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and RFC. (Tr. 28, 70-78.) Based on the ALJ's hypothetical, the VE identified three light level jobs and two

---

[26] Other publications include the *County Business Patterns*, published by the Bureau of Census; *Census Reports*, also published by the Bureau of Census; *Occupational Analyses*, prepared for the Social Security Administration by various State employment agencies; and Occupational Outlook Handbook, published by the Bureau of Labor Statistics. 20 C.F.R. 404.1566(d)(2)-(5); 416.966(d)(2)-(5).

sedentary level jobs that Ms. Apodaca could perform,[27] identified their DOT numbers, and testified regarding the number of available jobs in the national economy as to each of them. (Tr. 74-75.) When questioned, the VE also affirmatively stated that her testimony was consistent with the DOT. (Tr. 76.) Thus, although Ms. Apodaca asserts in her briefing that the VE based her job numbers on OES Groups, the Court agrees with the Commissioner that there is nothing in the administrative hearing transcript to indicate that the VE relied on, referred to, or extrapolated numbers from OES Groups. And the Court will not assume facts that are not in the record. Further, Ms. Apodaca has failed to present any evidence that the VE was not qualified to testify in her professional capacity regarding the number of available jobs or that the DOT was not a reliable source. *Rogers*, 312 F. App'x at 142; 20 C.F.R. §§ 404.1566(d) & (e) and 416.966(d) & (e). To the contrary, Ms. Apodaca's counsel had no objections to Ms. White's qualifications as an expert. (Tr. 71.) Although Ms. Apodaca argues that her counsel expressed an objection to the expert testifying about the number of jobs that may exist in the labor market unless she produced valid, published data to support her testimony (Doc. 24 at 8), Ms. Apodaca's counsel never questioned the VE as to this issue despite being given the opportunity to do so.[28] As such,

---

[27] Ms. Apodaca argues the sedentary jobs should be precluded from the step five analysis because using Table 1 of the Medical-Vocational Guidelines would have directed a finding of disabled. (Doc. 18 at 21-22.) The Court does not address this argument because even if the Court only considers the light level jobs the VE identified, it finds the ALJ appropriately relied on the VE testimony that jobs existed in significant numbers in the national economy as substantial evidence.

[28] The record supports that on June 26, 2014, Ms. Apodaca's counsel submitted a letter to ALJ Rolph requesting the issuance of a Subpoena Duces Tecum to the vocational expert to insure she brought certain documents to the hearing upon which she intended to rely in forming her opinions. (Tr. 362-63.) Ms. Apodaca's counsel further stated that he raised an objection to the VE testifying about the number of jobs that may exist in the labor market unless she produced valid, published data to support her testimony. (Tr. 363.) Prior to the hearing, ALJ Rolph denied Ms. Apodaca's counsel's request to issue a subpoena duces tecum. (Tr. 18.) At the administrative hearing, ALJ Rolph advised Ms. Apodaca's counsel that

> [a]dditionally, Mr. Armstrong, obviously, you've requested copies of all the materials that our vocational expert, Ms. White, may rely upon in rendering her testimony today, if, in fact, she does testify. I denied that subpoena, but I do want you to know *I'll give you very liberal opportunity to cross-examine her as to the basis of her opinion, what materials she's relied upon.* I believe all those materials are readily available in the public domain, easily accessible. And requiring

Ms. Apodaca has failed to provide any factual or legal basis demonstrating that it was improper for the ALJ to rely on the VE's testimony as substantial evidence. *See Rogers*, 312 F. App'x at 142 (explaining that ALJ could rely on VE testimony as substantial evidence where the VE testified based on professional experience, identified the number of jobs that existed in the national economy, and testimony addressed any conflicts between the claimant's exertional requirements and the jobs identified in the DOT).

For the foregoing reasons, the Court finds the ALJ appropriately relied on the VE's testimony that a significant number of jobs existed in the national economy as substantial evidence. As such, there is no reversible error as to this issue.

**E.** **The ALJ Directly Addressed Ms. Apodaca's Limitation to Alternate Between Sitting and Standing**

Ms. Apodaca's final argument rests on her assertion that there was a recognized conflict between the VE's testimony and the DOT related to her limitation to alternate between sitting and standing that the ALJ failed to resolve. (Doc. 18 at 24-26, Doc. 24 at 10.) Ms. Apodaca explains that because the VE testified she could perform jobs with a sit/stand option and the DOT is silent as to a sit/stand option, the ALJ was required to explain the discrepancy between the VE's testimony and the DOT. (*Id.*) The Commissioner contends that the ALJ appropriately consulted a VE about the implications of the sit/stand option on the occupational base. (Doc. 22 at 16.) The Commissioner further contends that because the DOT does not address a sit/stand option, Ms. Apodaca has failed to demonstrate any conflict. (*Id.* at 16-17.)

The Tenth Circuit has held that "before an ALJ may rely on expert vocational evidence as substantial evidence to support a determination of nondisability, the ALJ must ask the expert

---

Ms. White to produce them all would probably be an unreasonable burden, but certainly feel free to cross-examiner her in regard to the source of her opinions, numbers, whatever.

(Tr. 41.) (Emphasis added.)

how his or her testimony as to the exertional requirement of identified jobs corresponds with the Dictionary of Occupational Titles, and elicit a reasonable explanation for any discrepancy on this point." *Haddock*, 196 F.3d at 1087. The Tenth Circuit has also held in unpublished cases that because the DOT does not discuss the availability of a sit/stand option, a VE's testimony about the availability of jobs with a sit/stand option does not raise an apparent conflict with the DOT. *See Wahpakeche v. Colvin*, 640 F. App'x 781, 785-86 (10th Cir. 2016) (unpublished) (holding that "DOT's silence concerning stand/sit options" for a specific job does not constitute a conflict with a VE's testimony that a claimant needs stand/sit options to perform that job); *see also Newburn v. Barnhart*, 62 F. App'x 300, 304 (10th Cir. 2003) (unpublished) (holding there was no unresolved discrepancy between the VE's testimony and the DOT where the ALJ directly addressed the issue of whether the designated jobs could be performed with the specified limitations on hours of standing or walking).

The Court is not persuaded that the DOT's silence regarding a sit/stand option creates a *per se* recognized conflict that must be resolved. *Wahpakeche*, 640 F. App'x at 785-86. Moreover, the ALJ directly addressed the issue of whether the designated jobs could be performed with the hypothetical sit/stand option as he was required to do. "Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision." *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991.) The ALJ's hypothetical specifically included, *inter alia*, that "[t]his individual must be allowed to sit or stand alternately at 30- to 45-minute intervals for 2 to 3 minutes at a time during which period she may remain on task." (Tr. 72.) When the ALJ asked the VE if Ms. Apodaca could perform her past relevant work based on his hypothetical, the VE answered, "Your Honor, I don't believe so. The need to sit and stand alternately would probably

take her out of the work that --- the kind of work she did at Intel." (Tr. 73.)  The ALJ then asked the VE whether there were other jobs in the regional or national economy that Ms. Apodaca could do based on the same hypothetical.  (Tr. 74.)  The VE proceeded to identify three light level jobs and two sedentary jobs.  (Tr. 74-75.)  After identifying the first job of "checker I," the VE was in the process of identifying the second job of "cleaner and polisher" when she stated, "[l]et me look at this one -- . . . – clarify the sitting and standing."  (Tr. 74.)  She then affirmatively stated she "believe[d] the person could be able to stand up while doing that."  (*Id.*) When the VE identified the "document preparer" job, she specifically stated again, "I believe the nature of the work allows the person to sit and stand or to be able to have that flexibility."  (Tr. 75.)  Thus, it is clear from the record that the ALJ directly addressed Ms. Apodaca's sit/stand limitation, and that the VE considered this limitation in the jobs she identified.  *Newburn*, 62 F. App'x at 304.

For the foregoing reasons, the Court finds the ALJ had no duty to resolve the alleged conflict regarding the VE's testimony and the DOT related to her need to alternate between sitting and standing before accepting the VE's testimony as substantial evidence.  *Wahpekeche*, 640 F. App'x at 786; *Haddock,* 196 F.3d at 1987; *Rogers*, 312 F. App'x at 142.  As such, there is no reversible error as to this issue.

## V.  Conclusion

For the reasons stated above, Ms. Apodaca's Motion to Reverse and Remand for Rehearing (Doc. 18) is **DENIED.**

_____
**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**